UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HOWARD J. BARNET, PETER L. BARNET, JANE L. BARNET, and SOTHEBY'S INC.,

        Plaintiffs,

-v.-

MINISTRY OF CULTURE AND SPORTS OF THE HELLENIC REPUBLIC,

        Defendant.

---

18 Civ. 4963 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

    This action revolves around the disputed ownership of a centuries-old, 14-centimeter-tall, bronze figure of a horse (the "Bronze Horse"). Plaintiffs Howard J. Barnet, Peter L. Barnet, and Jane L. Barnet (collectively, the "Barnet Plaintiffs"), along with Sotheby's, Inc. ("Sotheby's," and together with the Barnet Plaintiffs, "Plaintiffs"), bring this action against Defendant Ministry of Culture and Sports of the Hellenic Republic (the "Ministry" or "Greece"), seeking a declaratory judgment that the Barnet Plaintiffs are the lawful owners of the Bronze Horse and, further, that Sotheby's may sell the figure on their behalf. Defendant, for its part, contends that the Bronze Horse was illegally removed from Greece and should be repatriated.

    Rather than resolve these issues through the litigation, Defendant asserts immunity from litigation, and moves to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). Specifically, Defendant argues that (i) the Court lacks subject matter jurisdiction over Plaintiffs' claims

pursuant to the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602-11; and (ii) Plaintiff Sotheby's lacks Article III standing because it does not sufficiently allege injury-in-fact. For the reasons set forth herein, Defendant's motion is denied.

## BACKGROUND[1]

### A. Factual Background

On November 16, 1973, Howard and Saretta Barnet purchased the Bronze Horse. (Compl. ¶ 21). The figure, which dates back to the 8th Century B.C.E., is an example of a common style of Greek statutes depicting horses from the Geometric period. (*Id.* at ¶¶ 16, 33). The Barnets added the Bronze Horse to their private art collection, displaying it at their New York home for more than 20 years. (*Id.* at ¶ 24). In 1992, Howard Barnet passed away and the ownership of the figure vested entirely in Saretta Barnet. (*Id.* at ¶ 26). In 2012, ownership of the Bronze Horse was transferred to the 2012 Saretta

---

[1] This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)). In addition, the Court considers the Ministry's letter to Sotheby's regarding the auction described *infra* (the "Demand Letter" (Dkt. #20)), which is incorporated by reference, and integral to the Complaint. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the [pleading] 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam))); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-60 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a motion to dismiss).

The Court refers to the parties' briefing as follows: Defendant's Memorandum of Law in Support of the Motion to Dismiss as "Def. Br." (Dkt. #20); Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss as "Pl. Opp." (Dkt. #22); and Defendant's Reply Memorandum of Law in Support of the Motion to Dismiss as "Def. Reply" (Dkt. #26).

Barnet Revocable Trust (the "Trust"), of which the Barnet Plaintiffs are the sole trustees. (*Id.* at ¶ 28).

In July 2017, after Saretta Barnet's death, the Barnet Plaintiffs consigned the Bronze Horse to Sotheby's for sale, along with numerous other items from the Barnet collection. (Compl. ¶¶ 29-30). Sotheby's planned to sell the Bronze Horse at an auction scheduled for May 14, 2018, in New York, New York. (*Id.* at ¶ 31). As is customary prior to any auction, on April 25, 2018, Sotheby's published an auction catalog online that included the Bronze Horse. (*Id.* at ¶¶ 32-33). The auction catalog described the provenance, or ownership history, of the Bronze Horse, which potential buyers use to confirm the authenticity of a work of art. (*Id.* at ¶ 34).

As described in its provenance, on May 6, 1967, the Bronze Horse was sold at a public auction in Switzerland by Münzen und Medaillen, a reputable European auction house, to an undisclosed buyer. (Compl. ¶ 23). At a later date, the Bronze Horse was acquired by Robin Symes from the 1967 auction purchaser. (*Id.* at ¶ 36).[2] Howard and Saretta Barnet acquired the Bronze Horse from Mr. Symes on November 3, 1973. (*Id.* at ¶ 34).

On May 11, 2018, the Friday prior to the Monday auction, Defendant e-mailed a letter to Sotheby's, demanding that the auction house immediately withdraw the Bronze Horse from the auction and repatriate the figure to Greece

---

2   At the time of the acquisition, Mr. Symes was a well-known and respected art dealer in London. (Compl. ¶ 58). However, many years later, Mr. Symes was widely accused of trading in looted antiquities. (*Id.* at ¶ 43).

3

(the "Demand Letter"). (Compl. ¶¶ 37, 39). The Ministry asserted that the Bronze Horse is cultural property that had been stolen from Greece, in violation of Greek patrimony laws. (*Id.* at ¶ 38). In support of Greece's claim of ownership, the Demand Letter referred to the figure's prior connection to Robin Symes, which had been publically disclosed in the Sotheby's auction catalog. (*Id.* at ¶ 43). In closing, the letter noted that Greece "reserves the right to take the necessary legal action in the competent courts in order to repatriate the coin [*sic*]." (Demand Letter 2).

The Demand Letter, irrespective of its merit, placed a cloud over the Bronze Horse's marketability, impairing Sotheby's ability to sell it on behalf of the Barnet family. (Compl. ¶¶ 51-52). Accordingly, Sotheby's immediately withdrew the Bronze Horse from the auction. (*Id.* at ¶ 52). Several days later, Sotheby's responded to the Demand Letter, rejecting Greece's claim of ownership, and inviting the Ministry of Culture to provide any other evidence to support its initial assertions. (*Id.* at ¶¶ 53-54). At present, the Bronze Horse is located in New York, New York. (*Id.* at ¶ 56).

**B.  Procedural Background**

Plaintiffs filed the Complaint in this action on June 5, 2018. (Dkt. #1). On September 12, 2018, Defendant requested leave to file a motion to dismiss. (Dkt. #15). On October 2, 2018, the Court held a pre-motion conference and set a briefing schedule for Defendant's motion to dismiss. (Dkt. #18). Defendant moved to dismiss the Complaint on November 5, 2018. (Dkt. #20). Plaintiffs filed an opposition brief on December 7, 2018. (Dkt. #22-23). This

4

motion became fully briefed when Defendant filed its reply brief on December 21, 2018. (Dkt. #26-28).

## DISCUSSION

**A.     Motions to Dismiss Under Rule 12(b)(1)**

Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States,* 201 F.3d 110, 113 (2d Cir. 2000)).

The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions. *See Carter* v. *HealthPort Technologies, LLC,* 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Carter,* 822 F.3d at 56. A plaintiff opposing such a motion bears "no evidentiary burden." *Id.* Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction. *Id.* (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)). And to make that determination, a court must accept as true the complaint's allegations "and draw[ ] all reasonable

5

inferences in favor of the plaintiff." *Id.* at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Carter*, 822 F.3d at 57. "In opposition to such a motion, [a plaintiff] must 'come forward with evidence of their own to controvert that presented by the defendant,' or may instead 'rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing.'" *Katz*, 872 F.3d at 119 (internal citations and quotations omitted). If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

**B.     The Court Has Subject Matter Jurisdiction Under the Commercial Activity Exception of the Foreign Sovereign Immunities Act**

Defendant argues principally that this Court lacks jurisdiction to consider Plaintiffs' claims due to Defendant's sovereign immunity. (Def. Br. 6-21). However, the Court finds that the act in question — Defendant's transmission of the Demand Letter, which halted the auction of the Bronze Horse — falls within the FSIA's commercial activity exception. As a result, Defendant is not immune from suit.

6

### 1. The Commercial Exception to the Foreign Sovereign Immunities Act

"The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Anglo-Iberia Underwriting Mgmt.* v. *P.T. Jamsostek*, 600 F.3d 171, 174-75 (2d Cir. 2010). Broadly, a foreign state is immune from federal court jurisdiction, unless a specific exception in the FSIA applies. *See Matar* v. *Dichter*, 563 F.3d 9, 12 (2d Cir. 2009). If such an exception applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

Here, Plaintiffs argue that Defendant's behavior falls within the commercial activity exception to the FSIA. (Pl. Opp. 7). The third prong of that exception, known as the "direct-effect clause," abrogates sovereign immunity when the action is based upon "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). To establish jurisdiction on that basis, the action must be (i) based upon an act outside the United States; (ii) that was taken in connection with a commercial activity of the foreign sovereign; and (iii) that caused a direct effect in the United States. *See Petersen Energia Inversora S.A.U.* v. *Argentine Republic & YPF S.A.*, 895 F.3d 194, 204 (2d Cir. 2018).

At the motion to dismiss stage, the defendant must first make a *prima facie* showing that it is a foreign state under the FSIA. *Kensington Int'l Ltd.* v. *Itoua*, 505 F.3d 147, 153 (2d Cir. 2007). Once the movant makes that showing, "the plaintiff has the burden of going forward with evidence showing that,

under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *Id.* This ultimate burden means that, the defendant must show that the alleged FSIA exception does not apply by a preponderance of the evidence. *Virtual Countries, Inc.* v. *Republic of S. Africa,* 300 F.3d 230, 242 (2d Cir. 2002).

### 2. Analysis

The parties do not dispute that Defendant is a foreign state pursuant to FSIA. Accordingly, the burden shifts to Plaintiffs to show that Defendant's conduct falls within the commercial activity exception to the FSIA.

#### a. Defendant Sending the Demand Letter Is the "Activity" Underlying the "Commercial Activity" Inquiry

The Court begins its "commercial activity" inquiry by identifying the particular conduct on which Plaintiffs' claim that the commercial activity exception applies is based. What matters at this step is that "the challenged action is based upon the particular conduct that constitutes the gravamen of the suit." *Petersen Energia Inversora S.A.U.,* 895 F.3d at 204 (internal quotations and citations omitted). In making this inquiry, courts must "zero[ ] in on the core of the plaintiffs' suit — the conduct that actually injured the plaintiffs." *OBB Personenverkehr AG* v. *Sachs,* 136 S. Ct. 390, 392 (2015).

In this case, identifying the basis of Plaintiffs' complaint is straightforward. Plaintiffs' core claim is that Defendant erred in asserting an ownership interest in the Bronze Horse when demanding that Sotheby's withdraw the figure from the auction. Accordingly, the Court finds — and Defendant does not dispute — that the foundation of lawsuit is the act of

8

sending the Demand Letter. (Def. Br. 14 ("Sotheby's admits that the gravamen of the suit is predicated on the sole act of Defendant sending a letter.")).

### b. The Sending of the Demand Letter Was "Commercial" in Nature Under the FSIA

The principal disagreement between the parties pertains to whether Defendant, as a foreign sovereign, was engaged in commercial activity. *See* 28 U.S.C. § 1605(a)(2). Plaintiffs argue that the relevant conduct, the act of sending the Demand Letter, was a commercial activity (Pl. Opp. 11-19), while Defendants assert that the act was purely sovereign in nature (Def. Br. 17-20). The Court agrees with Plaintiffs.

To review, for the Court to find that jurisdiction has been established under the "direct-effect" clause, it must find that Defendant's action was "taken in connection with a commercial activity of the foreign sovereign." *Petersen Energia Inversora S.A.U.*, 895 F.3d at 204. The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603. As the plain language of the statute makes clear, "the commercial nature of an activity does not depend upon whether it is a single act or a regular course of conduct." *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 612 (1992) ("*Weltover II*").[3]

Further, the FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or

---

[3] For that reason, the Court rejects Defendant's argument that the instant case does not fall under the FSIA exception because it involves "an isolated act," rather than a "sustained pattern of conduct." (Def. Br. 12).

9

particular transaction or act, rather than by reference to its *purpose*." 28 U.S.C. § 1603(d) (emphases added). Accordingly, "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *Weltover II*, 504 U.S. at 607. Rather, "the issue is whether the government's particular actions (whatever the motive behind them) are the *type* of actions by which a private party engages in commerce." *Id.* (emphasis in original). When assessing the commercial character of an activity, courts must be careful "to isolate the specific conduct that underlies the suit, rather than focusing on the broad program or policy of which the individual transaction is a part." *Weltover, Inc.* v. *Republic of Argentina*, 941 F.2d 145, 150 (2d Cir. 1991) ("*Weltover I*"), *aff'd*, 504 U.S. 607 (1992) (internal quotations and citations omitted). Otherwise, a foreign sovereign's activity "would almost inevitably be characterized as sovereign in nature, rather than commercial." *Id.*

Here, the nature of Defendant's activity — attempting to intervene in the market to assert and enforce its purported property rights — is clearly the type of activity that private persons can, and often do, engage in. When title to a work of art is disputed, private parties routinely assert their property rights in the disputed piece, oftentimes triggering declaratory judgment actions. *See, e.g., Coffaro* v. *Crespo,* 721 F. Supp. 2d 141, 144 (E.D.N.Y. 2010) (noting that after plaintiff consigned a painting to Sotheby's for auction, individual "defendant wrote to Sotheby's and asserted a claim of ownership" over the artwork); *see also Kamat* v. *Kurtha,* No. 05 Civ. 10618 (KMW) (THK), 2008 WL

10

5505880, at *3 (S.D.N.Y. Apr. 14, 2008) (noting that Sotheby's withdrew artwork from an auction after individual defendant "saw the painting in Sotheby's catalogue [and] asserted ownership"), *report and recommendation adopted*, No. 05 Civ. 10618 (KMW) (THK), 2009 WL 103643 (S.D.N.Y. Jan. 15, 2009).

In opposition, Defendant attempts to characterize the conduct at issue, not as an assertion of property rights, but as a uniquely governmental effort to police the heritage of its nation. (Def. Br. 18). Because the letter was sent "in fulfillment of the Ministry's public purpose," Defendant argues that "it could not have been sent by a private party," and therefore the act is not commercial in nature. (*Id.* at 20). However, the fact that Defendant sent the Demand Letter in order to protect its cultural heritage is immaterial to the Court's analysis. *See Weltover II*, 504 U.S. at 612. In making this argument, Defendant conflates the nature with the purpose of the act. While the *purpose* of sending the Demand Letter may have been to fulfill the Ministry's constitutional mandate to protect Greece's cultural heritage, the *nature* of the act is analogous to a private citizen attempting to enforce his property rights.

Furthermore, Defendant's assertion that "[t]he protection of heritage has never been considered commercial activity by the Second Circuit, the Supreme Court, or any other court" (Def. Br. 20), only goes so far. While the Second Circuit has not had the opportunity to address the issue, courts have found that acts taken in furtherance of a sovereign's cultural mission can be commercial in nature. In *Cassirer* v. *Kingdom of Spain*, an American citizen

11

filed suit to recover a painting from Spain, which claimed ownership. 616 F.3d 1019, 1022 (9th Cir. 2010). Spain moved to dismiss the case by asserting sovereign immunity on the basis of the FSIA, arguing that it had not engaged in "commercial activity." *See id.* at 1032. The Ninth Circuit held that "it does not matter that [Spain's] activities are undertaken on behalf of a non-profit museum to further its cultural mission," because "the commercial character of an activity depends on its nature rather than its purpose." *Id.* Likewise, in *Smith* v. *Overseas Korean Cultural Heritage Foundation*, the D.C. District noted that "the establishment and operation of a cultural museum, while rooted in policy interests promulgated by the government of South Korea, is an act in which both public and private entities may engage." 279 F. Supp. 3d 293, 297 (D.D.C. 2018). As such, the court concluded, "the act is 'commercial.'" *Id.*

For the sake of completeness, the Court addresses one lingering argument: that the sending of the Demand Letter was not commercial activity because Greece "has no intention to sell the Bronze," (Def. Br. 11), "did not seek to generate business activity for Greece" (*id.* at 12), and would receive "no commercial benefit for the Ministry" if the Bronze Horse were repatriated (*id.*). Supreme Court precedent flatly contradicts this argument. A foreign sovereign does not need to act with a profit motive in order to engage in commercial activity. *See Weltover II*, 504 U.S. at 607. "Such a requirement would

12

eviscerate the "commercial activity" exception of the FSIA, because foreign sovereigns often act without a profit motive." *Weltover I*, 941 F.2d at 150.[4]

### c. The Demand Letter Had a Direct Effect in the United States

In addition to finding that Greece was involved in commercial activity, the FSIA requires that the commercial act in question cause a direct effect in the United States. 28 U.S.C. § 1605(a)(2). "In order to be direct, an effect need not be substantial or foreseeable, but rather must simply follow as an immediate consequence of the defendant's activity." *Atlantica Holdings* v. *Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016) (internal citations and quotations omitted). In *Guirlando* v. *T.C. Ziraat Bankasi A.S.*, the Second Circuit clarified that, "by immediate, we mean[ ] that, between the foreign state's commercial activity and the effect, there was no intervening element." 602 F.3d 69, 74 (2d Cir. 2010) (internal quotations and citations omitted). "The conduct must flow[ ] in a straight line without deviation or interruption." *Martin* v. *Republic of S. Africa*, 836 F.2d 91, 95 (2d Cir. 1987).

The Court has little difficulty concluding that the Demand Letter had the immediate effect of causing Plaintiffs to withdraw the Bronze Horse from the auction. On May 11, 2018, one business day prior to the scheduled auction, Defendant sent Sotheby's the Demand Letter, which asked Sotheby's to "immediately withdraw the ancient Greek figurine of the list from the items to

---

[4] Defendant's briefing is inconsistent on this point. Several pages later, Defendant contradicts its prior arguments by stating that, "as noted by the Supreme Court, profit is not central to the determination of whether an activity is 'commercial.'" (Def. Br. 17-18).

13

be auctioned on May 14, 2018." (Demand Letter 1). "The threats and allegations in the demand letter put Plaintiffs in the untenable position of selling an object to which there was a competing claim of ownership, and where they were being threatened with litigation and criminal prosecution." (Pl. Opp. 9). For that reason, Plaintiffs withdrew the Bronze Horse from the New York auction. (Compl. ¶¶ 51-52).

In response, Defendant pivots to argue that the alleged conduct — the sending of the Demand Letter — was not "legally significant." (Def. Br. 14-16). Broadly, the Second Circuit "requires that the conduct having a direct effect in the United States be legally significant conduct in order for the commercial activity exception to apply." *Virtual Countries, Inc.*, 300 F.3d at 240. Put differently, Plaintiff must show a causal connection between the act and the alleged injury it sustained. *See MMA Consultants 1, Inc.* v. *Republic of Peru*, 245 F. Supp. 3d 486, 509 (S.D.N.Y.), *aff'd*, 719 F. App'x 47 (2d Cir. 2017) (summary order), *cert. denied*, 139 S. Ct. 85 (2018).

Defendant disputes that Plaintiffs withdrew the Bronze Horse from the auction because of the Demand Letter and alleges that "any economic harm was caused by Plaintiff and not by the Ministry's brief letter." (Def. Br. 15). According to Defendant, "Sotheby's knew of the problems with the Bronze and withdrew it for that reason." (*Id.*). It was only later, when Plaintiffs filed the instant suit, that concerns about the figure's ownership history and association with Mr. Symes became public, thereby placing a cloud over the figure's marketability. (*Id.* at 15-16).

The Court disagrees. *First*, the Complaint clearly alleges that Plaintiffs withdrew the Bronze Horse from the auction upon receipt of the Demand Letter, which explicitly asked them to do just that. (Compl. ¶¶ 51-52). Nothing in the record supports Defendant's position that Plaintiffs withdrew the figure for any other reason. *Second*, the "problems" with the Bronze Horse to which Defendant alludes involve Mr. Symes's prior ownership of the piece. However, Mr. Symes purchased the piece from a reputable auction house, a fact that Plaintiffs disclosed in the publicly available auction catalogue. (*Id.* at ¶¶ 34, 43-44). Therefore, the piece is arguably not amongst those in Mr. Symes's collection with questionable origins. The Court cannot find that Sotheby's, after publishing the Bronze Horse's provenance, withdrew the figure from the auction weeks later due solely to issues with that provenance, and only coincidentally one day after receiving the Demand Letter.

Accordingly, Plaintiff has demonstrated that Defendant lacks sovereign immunity due to the FSIA commercial exception and Defendant has not met its ultimate burden of persuasion. The Court has subject matter jurisdiction over the instant action and turns to the issue of standing.

**C.     Plaintiff Sotheby's Has Standing to Bring This Action**

**1.     Standing Generally**

Article III of the Constitution limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const., Art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List* v.

15

*Driehaus*, 573 U.S. 149, 156 (2014) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan*, 504 U.S. at 560). "The plaintiff must have [i] suffered an injury in fact, [ii] that is fairly traceable to the challenged conduct of the defendant, and [iii] that is likely to be redressed by a favorable judicial decision." *Id.*

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal quotations marks and citation omitted). "'[T]hreatened injury must be *certainly impending* to constitute injury in fact,' and … '[a]llegations of *possible* future injury' are not sufficient." *Clapper* v. *Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore* v. *Ark.*, 495 U.S. 149, 158 (1990)).

2. **Application**

The Court observes at the outset that Defendant raises a facial attack on Sotheby's standing to sue. (Def. Br. 21-22). Defendant argues that Sotheby's lacks standing to bring the declaratory judgment action because Sotheby's has not satisfied the injury-in-fact prong of the standing inquiry for three reasons: (i) Plaintiffs withdrew the Bronze Horse from the auction "because the Ministry presented legitimate concerns as to the item's provenance" (*id.* at 22); (ii) Sotheby's had no ownership claim in the Bronze Horse, "given that the title was not transferred to Sotheby's" (*id.*); and (iii) "Sotheby's is shifting blame onto

16

Defendant for purportedly alerting potential buyers to the disputed provenance of the Bronze, when actually it was Sotheby's who publicized the matter by filing suit" (*id.*).

The Court is not persuaded by Defendant's arguments. *First*, despite not having title to the Bronze Horse, as a consignee, "Sotheby's has its own particularized economic interest in being able to sell the Bronze Horse, in particular its right to earn a commission upon the sale." (Pl. Opp. 24). *Second*, as discussed *supra*, Defendant's claim that Plaintiffs withdrew the Bronze Horse due to their own concerns flatly contradicts the factual allegations in the Complaint — which allegations, on a facial challenge, the Court must accept as true. (Compl. ¶¶ 51-52). *See Carter* v. *HealthPort Techs.*, LLC, 822 F.3d 47, 57 (2d Cir. 2016). *Third*, even if it were possible for Plaintiffs to withdraw the Bronze Horse from the auction in secret, Sotheby's warrants and represents to potential buyers that buyers will obtain good title to items they purchase. (Pl. Opp. 25). Therefore, Defendant's Demand Letter necessitated that Sotheby's inform potential buyers of Defendant's competing claim to ownership, whether or not the matter was further publicized by filing a suit. (*Id.*).

*Finally*, in the Demand Letter, Defendant threatened "to take the necessary legal action in the competent courts in order to repatriate the coin [sic]." (Demand Letter 2). Defendant's threat of legal action against Sotheby's, which was sufficiently concrete and imminent, is a separate and independent basis for standing. *See Digital Angel Corp.* v. *Corporativo SCM, S.A. de C.V.*, No. Civ. 05-1060 (ADM) (JJG), 2005 WL 3357084, at *4 (D. Minn. Dec. 9, 2005)

(finding injury-in-fact requirement satisfied by threat of legal action in letter sent to plaintiff); *Pony Pal, LLC.* v. *Claire's Boutiques, Inc.*, No. 05 Civ. 2355 (CSH), 2006 WL 846354, at *4 (S.D.N.Y. Mar. 31, 2006) ("A party has a right to seek declaratory judgment where a reasonable apprehension exists that if it continues an activity it will be sued by another party."). For these reasons, the Court finds that Sotheby's has standing to initiate the instant action.

## CONCLUSION

For the reasons stated in this Opinion, Defendant's motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motion at docket entry 20. On or before **July 8, 2019**, the parties shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

SO ORDERED.

Dated: June 21, 2019
       New York, New York

                                      KATHERINE POLK FAILLA
                                      United States District Judge